IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VALDA ROSE,                                :
    Plaintiff                           :
                                        :
v.                                         :     CIV. NO. AMD 04-3422
                                        :
SON'S QUALITY FOOD COMPANY,                :
et al.,                                    :
    Defendants                          :

...o0o...

## MEMORANDUM OPINION

Plaintiff, Valda Rose ("Rose"), who is African American, was employed as a head cook by defendant Son's Quality Food Company ("Son's"), which had a federal food service contract covering a military base in Maryland. Rose's employment was terminated for misconduct. Seeking redress, Rose instituted this action, asserting claims for race- and sex-based discrimination and retaliation against her employer under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, and a claim for intentional infliction of emotional distress under Maryland law against Son's and several fellow employees. Discovery has concluded and now pending is defendants' motion for summary judgment. No hearing is needed. For the reasons stated within, the motion shall be granted.

I.

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A fact is material for purposes of summary judgment, if, when applied to the substantive law, it affects the outcome of the litigation. *Id*. at 248. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Karim v. Staples, Inc.*, 210 F. Supp. 2d 737, 740 (D.Md. 2002).

## II.

Rose was employed by Son's from January 7, 2000, until September 22, 2001, when her employment was terminated. She was employed as an alternate head cook from January 2000 until October 2000, when she was promoted to head cook. While employed by Son's, Rose was a member of the Petroleum, Construction, Tankline Drivers, Yeast, Soft Drink Workers and Driver-Salesmen, Amusement and Vending Servicemen, Allied Workers, Warehouse, Retail and Mail Order Employees, Local Union No. 311, affiliated with the International Brotherhood of Teamsters ("the Union"). The Union and Son's had a collective bargaining agreement which was in effect during Rose's employment.

Defendant Anthony Clark was Rose's immediate supervisor. Indisputably, Clark sexually harassed Rose up until March 2001. His actions included the following distasteful and repugnant activities: (1) calling Rose "pretty;" asking other employees to perform sexual acts on him and then speaking to her in detail about it; (2) pulling at the name tag on her chest and grabbing her breast in the process; (3) asking her sexual questions regarding white

men; (4) following her around the building; and, on at least two occasions, into the bathroom; (5) attempting to pull her pants down in the bathroom; and (6) putting a banana down by the front of his pants, in front of Rose and others, calling her attention to it, shaking it, and then telling others about it. Rose repeatedly protested Clark's behavior to him and insisted that it cease, but there is no substantial evidence that she complained to management about the harassment.

On March 3, 2001, the date Clark taunted her with the banana and followed her into the bathroom, Rose complained to Gerald LaRuffa, Clark's superior. Shortly thereafter, on or about March 13, 2001, Rose's complaint about Clark prompted a full investigation by Son's into Clark's behaviors in the workplace. Clark was required to apologize to Rose and he was transferred away from Rose's work area pending the investigation. It is undisputed that Clark's inappropriate behavior toward Rose ceased at the time he was transferred. At the conclusion of the investigation, on or about April 2, 2001, Son's terminated Clark's employment.

The viability *vel non* of Rose's sexual harassment claim rests significantly on her contention that following her complaints about Clark that led to his termination, her remaining supervisors stopped speaking to her and assigned her menial tasks that had not been her responsibility prior to her complaint, thus, in effect, according to Rose, continuing the harassment. Furthermore, according to Rose, when she complained during the summer of 2001 that the cooks whom she supervised were threatening her, calling her "bitch," "black

-3-

bitch," "motherfucker," and saying they were going to "fuck her up," the supervisors took no action, again, according to Rose's theory of the case, in order to continue the harassment that Clark had carried out prior to his termination.

On September 22, 2001, Rose engaged in a heated physical confrontation with one of the cooks at the workplace, Janet Rhodes. In front of numerous witnesses, Rose threatened to "chop the fucking head off" of Rhodes while wielding, above her shoulders, a metal dustpan attached to a long broom handle. Rose's actions violated the rules and regulations contained in the company handbook, specifically forbidding physically threatening behavior in the workplace. Son's conducted a full and complete investigation of the incident, which included interviews of witnesses. Rose's employment was terminated after this incident on September 24, 2001. Rose filed a grievance with the Union challenging her discharge pursuant to the collective bargaining agreement. The Union determined that Son's had just cause for Rose's termination and that insufficient evidence existed for an appeal of the termination.

Rose has advanced a state law claim for intentional infliction of emotional distress, in support of which she has asserted that, as a result of the discriminatory and retaliatory actions against her, she became physically and emotionally ill. Her symptoms allegedly included: an inability to get out of bed for approximately two months following her termination; an inability to perform the normal functions of daily life; emotional distress; severe depression; severe headaches; nausea and vomiting; and chest pains. Most

explosively of all, she alleged that she suffered a miscarriage in November 2001 as a result of defendants' acts and omissions.

On July 15, 2002, Rose filed a charge with the Equal Employment Opportunity Commission against Son's, claiming harassment based upon race and sex, and retaliatory discharge, all in violation of Title VII. On August 19, 2004, the EEOC issued Rose a right to sue letter. Rose timely filed her judicial complaint in the Circuit Court for Harford County on September 20, 2004, and defendants removed the action to this court on October 22, 2004.

III.

Son's argues that plaintiff's sexual harassment claim, stemming as it does from actions by Clark occurring prior to September 19, 2001, is time-barred. Son's correctly asserts that in Maryland, Title VII requires a plaintiff to file an employment discrimination charge with the EEOC no later than 300 days of the alleged adverse action. *See, e.g., Bryan v. Lucent Technologies, Inc.,* 307 F. Supp.2d 726, 734 (D. Md.), *aff'd*, 112 Fed.Appx. 285 (4th Cir. 2004). As just mentioned, Rose's sexual harassment claim arises from incidents involving her former supervisor, Clark. Plaintiff admits that Clark's inappropriate conduct ended on March 13, 2001, when Son's transferred him to a different worksite. Therefore, Rose was required to file an EEOC charge of sexual harassment within 300 days, i.e., no later than January 7, 2002. However, plaintiff did not file a charge with the EEOC until July 16, 2002, more than six months after the deadline.

Under some circumstances, plaintiffs alleging harassment claims may utilize the "continuing violation" theory so that acts that fall outside the statutory time period can be considered as part of the discrimination claim. *Id.* at 736-37. In order to establish a continuing violation claim, however, plaintiff must show that the harassment is part of an ongoing practice or pattern, rather than an isolated or sporadic event. *See National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 109-13 (2002); *Dachman v. Shalala*, 46 F. Supp. 2d 419, 435 (D. Md. 1999) (citing *Beall v. Abbott Laboratories*, 130 F.3d 614, 620 (4th Cir. 1997)).

Here plaintiff purports to assert a continuing violation claim, arguing that unspecified mistreatment by her superiors, the use of profanity among her co-workers and subordinates, the lack of support she received from management in disciplining those who used profanity, and her ultimate termination, where all incidents of continuing sexual harassment that commenced with the acts of Clark prior to his termination. This contention is deeply flawed, however. *See Bryant,* 307 F.Supp.2d at 736-37. Manifestly, plaintiff's assertion that her allegations of sexual harassment at the instigation of Clark may be combined with later acts giving rise to allegations of race-based harassment is a non-starter. The facts, as alleged and thinly supported by plaintiff, indicate that she suffered from sexual harassment as a subordinate of Clark, but that such harassment ceased even before his termination. The arguably racial harassment (discussed *infra*) generated by her co-workers later on is supported (if at all) by proof of acts different in kind and degree from those engaged in by

Clark. Accordingly, plaintiff cannot salvage her time-barred sexual harassment claim by linking it to her ostensible race based hostile work environment claim.

IV.

Rose asserts a timely charge of race-based harassment. That is, Rose contends that the frequent use of racially-laced profanity in the workplace constituted the creation of a hostile work environment based on race.[1] To survive summary judgment on a claim of a racially hostile work environment, plaintiff "must project evidence sufficient if believed to permit a reasonable fact finder to conclude by a preponderance of the evidence the following elements: (1) that the conduct in question was unwelcome; (2) that the harassment was based on race; (3) that the harassment was sufficiently pervasive or severe to create an abusive working environment; and (4) that some basis exists for imputing liability to the employer." *Bernard v. Calhoon MEBA Engineering School*, 309 F.Supp.2d 732, 738 (D. Md. 2004).

Although the court will presume that prongs one and two of the above test are satisfied (it is undisputed that the plaintiff found the workplace profanity and the associated conduct to be unwelcome, and, assuming the allegations of the plaintiff to be true, some of the comments were racially-tinged), the third prong is not satisfied. As a matter of law, what

---

[1] Plaintiff generally asserts that Son's failed to create and maintain effective policies to educate and deter sexual and racial harassment. Notably, however, plaintiff has provided no record evidence to add credence to this assertion; to the contrary, the summary judgment record contains ample evidence of Son's anti-discrimination policies and its customary enforcement. Moreover, it is undisputed that Son's not only initiated a prompt investigation that culminated in Clark's termination, but that management supplied the various worksites with flyers addressing workplace harassment, provided information on appropriate conduct when in the workplace, and forbade profanity.

plaintiff complains about here is racially neutral profanity (e.g., "bitch," "motherfucker," "dummy," "ignorant," "fuck her up," "black dummy" and "black bitch"), not the sort of invective characteristic of a racially hostile environment.

The third prong of the test requires that the harassment be sufficiently pervasive or severe to create an abusive working environment and/or alter terms and conditions of employment. *Id*. In determining whether the allegedly harassing acts identified here satisfy the criterion, the conduct in question is not to be measured in isolation but rather by the totality of the circumstances. An environment can be adjudged to be sufficiently hostile when "looking at all the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)(sexual harassment case).

Here, the addition of the word "black" to the otherwise racially neutral name-calling and profanity does not support a claim of hostile environment. It is well settled that offensive remarks that do not create an objectively hostile environment or that create mere discomfort are insufficient to establish a claim for a hostile work environment. *Beall v. Abbott Laboratories*, 130 F.3d 614, 620 (4th Cir. 1997) ("Title VII simply does not guarantee freedom from insensitive remarks that do not create an objectively abusive work environment."); *see also Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)("Mere utterance of an epithet which engenders offensive feelings in an employee

does not sufficiently affect the conditions of employment to implicate Title VII"). Therefore, under a totality of the circumstances shown here, the comments and profanity used in the workplace, albeit inappropriate and insensitive, do not rise to the level of an actionable Title VII claim of race-based harassment.[2]

V.

Under the circumstances of this case, to survive summary judgment as to a claim of retaliation, plaintiff must first establish a prima facie case, namely, that: (1) she engaged in a protected activity; (2) the employer took adverse action against her; and (3) a causal connection exists between the protected activity and the adverse action. *McNarrin v. Sullivan*, 929 F.2d 974, 980 (4th Cir. 1991). If the plaintiff establishes a prima facie case a presumption of discrimination arises and the burden of production is shifted to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Cf. St. Mary's Honor Center v. Hicks*, 509 U. S. 502, 509 (1993). The employee bears the ultimate burden of proving that the reason provided is pretextual, and that the employer intentionally retaliated against her. *Id.* Here, Rose is unable to establish a prima facie case and thus summary judgment is warranted. Moreover, even if she were successful in

---

[2]Son's correctly argues that plaintiff has failed to marshal substantial probative evidence that the admittedly recurring problem of employee use of profanity in the workplace was race-based or particularly directed at plaintiff in any event. The record shows that while there were clear company rules prohibiting profanity in the workplace, the workers (including Rose and even officers of the Union) did not always comport themselves in accordance with the rules. Rose's anecdotal accounts of excessive profanity do not rationally support a claim for harassment based on *race*.

establishing a prima facie case, Rose has failed to generate a genuine dispute on the issue of pretext.

It is undisputed that the Rose complained about Clark's behavior and thus engaged in a protected activity under Title VII. Moreover, a termination is clearly an adverse employment action.[3] However, Rose has failed to provide any evidence that Son's terminated her because she invoked the protections of Title VII, i.e., because she complained of the sexual harassment. In *Jaudon v. Elder Health, Inc.*, 15 F.Supp.2d 153, 165 (D.Md. 2000), the court recognized that "factors pertinent to the causation element may include temporal proximity between the two events, an intervening pattern of retaliatory conduct, inconsistent reasons by the employer for the adverse action, and differential treatment of other employees." The Supreme Court has held that "cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark County School*

---

[3]Rose asserts that the alleged actions by her superiors (e.g., not talking to her, failing to discipline users of profanity in the work place and lack of disciplinary support) taken after she complained of Clark's conduct amounts to an "adverse employment action" cognizable under the Title VII anti-retaliation provision. However, the law regarding adverse employment actions in this Circuit is well settled. A claim for retaliation will only be successful where the "discriminatory acts or harassment adversely effected 'the terms, conditions, or benefits of the plaintiff's employment.'" *VonGuten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001)(citing *Munday v. Waste Mgmt of North America, Inc.*, 126 F.3d 239, 243 (4th Cir. 1997)). Of course, termination of employment is not the only example of adverse employment action; however, Title VII requires more than actions which merely make the employee unhappy or uncomfortable. *See Chika v. Planning Research Corp.*, 179 F. Supp.2d 575, 585 (D. Md. 2002). Here there is no evidence that, apart from her termination, the terms, benefits or conditions of Rose's employment changed after she complained about Clark.

*District v. Breeden*, 532 US 268, 273-274 (2001); *see also Dowe v. Total Action Against Poverty in Roanoke Valley*, 45 F.3d 653, 657 (4th Cir, 1998)("A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two."). Here the undisputed evidence shows that Rose was not terminated until September 2001, more than six months after she complained to management about Clark's behavior. The six-month period that lapsed between plaintiff's exercise of her protected rights and the adverse employment action renders an inference of causality tenuous to the point of evaporation.

Even if, on this record, the absence of temporal proximity is deemed not determinative by itself, Rose has failed to provide any evidence of other factors useful in establishing a causal relationship.[4] Moreover, no evidence has been provided to establish a pattern of retaliatory conduct. Finally, the undisputed facts indicate that Son's has provided a clear and consistent reason for her termination. At bottom, as no causal connection is shown to exist between Rose's invocation of her rights and the termination of her

---

[4]Even if Rose were able to establish a prima facie case of retaliation (or, for that matter, disparate treatment discrimination), she has utterly failed to generate a genuine dispute of material fact as to Son's legitimate, non-discriminatory, non-retaliatory reason for her termination. The employee handbook states clearly that "fighting or scuffling while on duty or in our contract working area" is grounds for immediate termination. It is undisputed that plaintiff engaged in a physical confrontation with a co-worker, during which she brandished a dust pan connected to a long broom handle and stated that she would "chop the fucking head off" a co-employee. Son's has consistently contended that plaintiff was terminated for fighting in the workplace. It is also important to note that the Union determined Son's had just cause for terminating the plaintiff. Title VII provides protection against illegal discrimination but "does not shield an employee from normal sanctions for misconduct." *Pagana-Fay v. WSSC*, 797 F.Supp. 462, 471 (D.Md. 1992).

employment, she has failed to make out a prima facie case.[5]

VI.

Plaintiff's intentional infliction of emotional distress claim is time-barred and, in any event, as a matter of law, does not survive summary judgment on the merits.

Maryland law requires that a tort action, such as the claim for intentional infliction of emotional distress, be brought within three years of the date that it accrues. *Knickman v. Prince George's County,* 187 F.Supp.2d 559, 563-64 (D. Md. 2002)(citing Md. Code Ann., Cts & Jud. Proc. §5-101 (1991)). Rose filed her complaint in state court on September 20, 2004; therefore, to be timely-filed, her state law claim for intentional infliction of emotional distress must have accrued no earlier than September 20, 2001. But the only acts even arguably pertinent to this claim that occurred on or after September 20, 2001, was Rose's confrontation with Rhodes on September 22, 2001, and Rose's termination two days later.

As a matter of law, Son's decision to terminate plaintiff's employment does not amount to "extreme and outrageous conduct" necessary to sustain a claim for intentional infliction of emotional distress. *See Hrehorovich v. Harbor Hosp. Center, Inc.,* 614 A.2d 1021, 1021 (Md. App. 1992)(holding that termination does not rise to the level of outrageousness required by this cause of action). Accordingly, defendants are entitled to

---

[5]Rose asserts, without evidentiary support, that other employees engaged in similar behavior and were caught fighting on the job but that no other employee had been terminated for this behavior. Bald assertions are insufficient to carry plaintiff's burden.

judgment on this claim.[6]

## VII.

For the reasons stated above, defendants' motion for summary judgment shall be granted. An Order follows.

Filed: January 25, 2006                                    /s/
                                                ANDRE M. DAVIS
                                                UNITED STATES DISTRICT JUDGE

---

[6]Even assuming that actions prior to September 20, 2001, could support plaintiff's state law claim, she is still unable to survive summary judgment. To establish a prima facie case, a plaintiff must project sufficient evidence to establish the following elements: (1) the conduct in question was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the conduct and the emotional distress; and (4) the emotional distress was severe. *Arbabi v. Fred Meyers, Inc.*, 205 F.Supp.2d 462, 465-66 (D. Md. 2002). The tort of intentional infliction of emotional distress "should be imposed sparingly and its balm reserved for those wounds that are truly severe and incapable of healing themselves." *Id*. at 466 (citation omitted). In this case, the court earlier denied defendants' motion to dismiss this claim pursuant to Fed.R.Civ.P. 12(b)(6) based largely on the explosive allegation that plaintiff's alleged miscarriage was proximately caused by defendants' acts and omissions. In the final analysis, plaintiff has adduced no proof whatsoever to support such claim.